**THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| **In the Matter of the** | ) | |
| **Inspection of:** | ) | |
| **Foundation Foods Group, Inc.** | ) | **Case No. 2:21-MC-16** |
| **Located at** | ) | |
| **2076 Memorial Park Drive** | ) | |
| **Gainesville, Georgia 30501** | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**EMERGENCY MOTION TO QUASH INSPECTION WARRANT**

COMES NOW, Foundation Foods Group, Inc. ("FFG"), by and through counsel, and moves to quash the warrant issued by this Court by order of April 20, 2021, upon a sealed application from the Occupational Safety and Health Administration ("OSHA"). The warrant is due to be quashed because the warrant (1) lacks proper probable cause; (2) may rely on information obtained during OSHA's illegal entry on January 28, 2021; (3) may rely on FFG's OSHA 300 log; (4) is not necessary as FFG has voluntarily cooperated; and (5) irreparably harms FFG by violating its Fourth, Fifth, and Sixth Amendment rights and imposing a great financial burden for which there is no remedy to recover. For these reasons, set forth in more detail below, FFG respectfully requests that this warrant be quashed.

**FACTS**

FFG is a chicken processing plant consisting of four facilities. Plant 4, the facility at issue, produces cooked or partially cooked product with five lines of

production.  As chicken is processed on each line, it must be frozen.  Until recently, the refrigeration was entirely ammonia.

### FFG Recently Chose to Utilize Nitrogen as a Refrigerant

In Spring 2020, FFG contracted with Messer, LLC to install FFG's first liquid nitrogen (N2) freezer on line 2.  This required Messer to install N2 tanks outside Plant 4 and pipes to carry the N2 from the tanks inside Plant 4 to the freezer.  In December 2020, Messer began installing an additional N2 freezer system on line 4, which is the equipment that had the fatal N2 release and resulted in this inspection.

FFG leases all N2 equipment from Messer who also supplied the N2 via multiple truckloads of N2 daily.  FFG began using the new line 4 freezer mid December 2020.  As of January 28, 2021, Messer was still on-site numerous times per week continuing to make adjustments and repairs to the line 4 freezer as the initial set-up and adjustments had not been completed nor had Messer formally handed the freezer over to FFG.  The line 4 freezer consists of an immersion freezer where the chicken travels through N2 at -360° for approximately eight second.  From the immersion freezer, the chicken continues through an enclosed transfer box into a large spiral freezer that is usually -75 to -125° for approximately 10 minutes.

### The Fatal Incident

On January 28, 2021, around 10:00 a.m., N2 appears to have overflowed the immersion freezer.  The Safety Data Sheet for N2 identifies its hazard as affixation

and causing burns or frostbite due to its cryogenic temperatures. Messer, along with FFG, OSHA, and the Chemical Safety Board ("CSB") entered into a site agreement identifying an "exclusion zone" as the relevant area for inspection. (Exh. 2). These parties have jointly conducted extensive post-incident testing of the line 4 freezer and discovered that the single safety device that monitored the N2 level in the immersion freezer was damaged. Specifically, it's a bubbler tube that was bent in such a way that it failed to monitor when the N2 level was too high and in danger of overflowing. This bubbler tube was not protected from being bent and there was no redundant or backup system to detect a high N2 level or otherwise prevent a catastrophic overflow. The boiling point where N2 vaporizes is -196°. The rate of expansion when N2 vaporizes is substantial depleting oxygen in the area.[1]

Immediately following the release of N2 from the line 4 freezer, the fire alarm was pulled, all employees in Plant 4 were evacuated, and 911 was called. There were no injuries or other problems noted during the evacuation. Employees knew where to go and FFG had conducted evacuation drills in the past. The Hall County Fire Department ("HCFD") responded to the call and set up a command center taking control of Plant 4. Police lines were established around Plant 4, which was deemed an accident and crime scene. By 4 p.m., the police told FFG management to leave

---

[1] At 68 degrees Fahrenheit, the expansion ratio for N2 gas to vapor is 1:696. The room where the release occurred was closer to 40 degrees Fahrenheit and got close to zero as the N2 release further cooled the area.

the property and go home without any request for assistance in securing the site. The site was released to OSHA late morning January 29, 2021, at which point OSHA held an opening conference with FFG and Messer, which began the investigation, and issued a preservation letter to FFG. (Exh. 5).

No inspection occurred on January 29, 2021, because the first responders had turned power off to Plant 4 during the incident before realizing that doing so could cause a hazard with the ammonia system. Because power had been cut, the HCFD's Hazmat team had to return to the building on January 29th and ensure the air quality was safe. Later that day, FFG hired a private Hazmat team to enter with a third-party refrigeration company to confirm the ammonia system was stable and otherwise safe to operate. No one else entered the building on January 29th for an inspection because Plant 4 could not be rendered safe until this work was complete.

**OSHA's Current Inspection**

The first official and consensual inspection occurred on January 30, 2021, with FFG and Messer accompanying OSHA and CSB. Later that day, OSHA's Compliance Safety and Health Officer ("CSHO), Robin Bennett, made FFG aware that she and another CSHO entered FFG's property, specifically Plant 4, around 3pm on January 28, 2021, and began OSHA's investigation observing the area and taking photos without holding an opening conference with FFG, notifying FFG of OSHA's presence on FFG's property, showing their official credentials, or otherwise

obtaining implicit or explicit consent to enter its property. FFG asserted at the time and maintains that OSHA's entry was (1) illegal in violation of FFG's 4th Amendment rights, (2) contrary to OSHA's own internal procedures (3) occurred at a time when the building remained unsafe especially in relation to the stability of the facilities' ammonia system of which OSHA was aware based on its December 2020 inspection, and (4) OSHA's actions impeded the ability to have an untainted investigation as evidence was disturbed during OSHA's illegal entry.

For weeks following the incident, FFG provided office and conference space to OSHA and CSB, responded to constant requests for information and documents, and arranged for approximately 100 interviews of hourly employees and managers. OSHA has been continuously conducting this investigation for just shy of three months. In addition to the informal assistance, FFG has formally produced over a thousand pages of documents in response to two OSHA subpoenas. FFG has permitted and assisted with dozens of entries into Plant 4 as part of the inspection. FFG permitted OSHA to perform an inspection outside the exclusion zone of the line 2 freezer based on OSHA verbally explaining what it believed constituted probable cause. Although OSHA's basis was questionable, FFG cooperated with OSHA and permitted the inspection, which did not appear to confirm OSHA's alleged probable cause or identify any other plain view hazards.

As early as the first inspection on January 30, 2021, CSHO Bennet and OSHA have taken the position that because the N2 leak involved a vaporizing gas that OSHA should be able to also inspect areas of Plant 4 with ammonia and CO2. As early as January 30, 2021, FFG declined to consent to such an expansion. OSHA's request for this warrant is an unwarranted continuation of its desire to so expand the investigation. Similarly, OSHA convinced this Court to include emergency exits and egress issues despite FFG having consented to and OSHA already inspecting these items. Specifically, at the time of the incident, the HCFD had not conducted its annual inspection of Plant 4, which was due in September 2020, because of the pandemic. FFG agreed to that inspection before any activity resumed at Plant 4. OSHA requested to participate in the walk-around inspection and FFG in an effort to continue cooperating even though there was no probable cause permitted OSHA to do so. OSHA and the HCFD identified exit sign and similar ordinance violations. FFG corrected the items and HCFD passed FFG's annual inspection on February 11, 2021, just six days after OSHA and CSB released Plant 4, minus the exclusion zone, to FFG. (*See* Email, attached as Exh. 6). The State Fire Marshal also reinspected all registered pressure vessels and boilers to be used during initial production following the incident, which all passed on February 18, 2021. Plant 4 resumed limited operations on 3 lines beginning February 24, 2021.

### OSHA's More Recent Requests to Expand its Investigation

CSHO Bennet called the undersigned around March 11, 2021, regarding an employee complaint that employees smelled ammonia. The undersigned verified management permitted workers in the area to go to the breakroom and if they were scared or did not feel safe they could go home for the day. FFG's third-party refrigeration technician was on-site at the time, came to the area and his gauge registered no presence of ammonia. The undersigned offered to provide proof of the technician's reading to OSHA. As OSHA knows, even an extremely small amount of ammonia can cause a strong smell that is irritating and does not indicate a hazard. The technicians concurrent reading confirmed no hazard existed. Later that day, someone called the HCFD who also came out and took readings and found no presence of ammonia or other hazard.

Despite providing OSHA that information, OSHA came on-site a day or two later asking to expand its investigation to include the plant's entire ammonia system. OSHA confirmed to the undersigned that OSHA had not even obtained information from the complainant about the area of Plant 4 where employees smelled the ammonia. As a result, OSHA wanted and expected to be permitted to inspect the entire facility's ammonia system. After confirming that OSHA's only information was that employees smelled ammonia in an unknown location within Plant 4, and that there was no other bases for requesting the inspection, the undersigned informed OSHA it lacked probable cause, and reiterated the offer to provide the technician's

reading showing there was no detectible level of ammonia present in the area. At OSHA's request, the undersigned confirmed that no employee was transported for or received medical attention related to smelling the ammonia.

On May 28, 2012, OSHA returned to FFG again demanding to expand its investigation based on a complaint that Familias Unidas of Georgia filed concerning, among other things, the same complaint about employees having smelled ammonia on March 11, 2018. (Informal Complaint, attached as Exh. 1). Because OSHA did not obtain any specific information that would suggest a potential violation, and OSHA already investigated and had information about most of the items referenced in the complaint, FFG declined to agree to expanding the accident investigation.

OSHA's filing its warrant application under seal was not done to provide an "element of surprise" and only served to ensure FFG could not provide this Court these facts before issuing a warrant. Moreover, OSHA's regulations require that when OSHA relies on a complaint to investigate, the complaint must include "reasonable particularity" *and must be provided to the employer before* OSHA begins its investigation. 29 C.F.R. § 1903.11(a). Seeking and obtaining a warrant in secret and refusing to provide the application, including any affidavit(s), that supported the warrant is inconsistent with OSHA's own regulation demonstrating OSHA's continued and blatant disregard for FFG's rights. Moreover, the warrant states that "the inspection will be conducted as soon as practicable after the issuance

of the warrant, upon presentment of appropriate credentials by the Compliance Officers and in the manner prescribed by 29 C.F.R. § 1903.7," which requires the facts be provided. But, also, CSHO Bennet told FFG that OSHA would be on-site for the full ten days permitted by the warrant rather than conducting the inspection "as soon as practicable" and as 29 C.F.R. § 1903.7(d) dictates ('the conduct of inspections shall be such as to preclude unreasonable disruptions of the operation of the employer's establishment"). So far, OSHA only inspected 2 to 3 hours per day informing FFG April 23rd after returning from lunch that they were done for the day.

## ARGUMENT AND AUTHORITY

OSHA's warrant should be quashed. In affirming a prior order of this Court involving the quashing of another warrant at a poultry facility sworn out by CSHO Bennett, the Eleventh Circuit affirmed that OSHA may not rely on a report of specific limited hazards or violations to support the expansion of an investigation. *In re Establishment Inspection of Mar-Jac Poultry, Inc*., 756 Fed. Appx. 856 (11th Cir. 2018); *Donovan v. Sarasota Concrete*, 693 F.2d 1061 (11th Cir. 1982); *In re Crider Poultry, Inc.,* 2010 WL 1524571 (S.D. Ga. 2010) (quashing OSHA warrant for a comprehensive inspection based on investigation arising from a specific complaint). With this warrant, OSHA seeks to achieve the precise result that these precedents forbid.

As the Eleventh Circuit described in *Mar-Jac*, OSHA is entitled to conduct two types of inspections. A programmed inspection arising from a general administrative plan based on neutral criteria or an unprogrammed inspection based on specific evidence of an existing violation. *Mar-Jac*, 756 Fed. Appx. at 860 citing *Donovan v. Sarasota Concrete,* 693 F.2d 1061 (11th Cir. 1982); *West Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 956-7 (11th Cir. 1982). In *Marshall v. Barlow's, Inc*., the Supreme Court set limits on OSHA's ability to conduct its inspections ruling that nonconsensual, warrantless OSHA inspections were unconstitutional, and that OSHA must have either the consent of the employer or a properly issued warrant to enter and inspect. 436 U.S. 307, 98 S. Ct. 1816 (1978). OSHA had neither when it entered Plant 4 on January 28, 2021.

In *Mar-Jac*, this Court held that expanding an unprogrammed inspection based on the Regional Emphases Program for Poultry Processing Facilities ("Poultry REP") posed a significant risk of abuse. *In re Establishment Inspection of Mar-Jac Poultry, Inc*., 2016 WL 8938586 *7 (N.D. Ga. 2016). If OSHA relied on its Poultry REP for this warrant that portion of the warrant should be quashed for the same reasons this Court quashed that portion of the *Mar-Jac* warrant.

As this Court and the Eleventh Circuit found, unprogrammed inspections have an "increased danger of abuse of discretion and intrusiveness" and should be given a "more individualized inquiry". *Mar-Jac*, 756 Fed. Appx. at 861 quoting *Sarasota*

*Concrete,* 693 F.2d at 1068. Accordingly, the Eleventh Circuit joined other courts in recognizing that a complaint inspection must bear an appropriate relationship to the violation alleged in the complaint, which precludes automatic expansion of a complaint inspection. See, e.g., *Id.; Marshall v. Horn Seed Co*., 647 F.2d 96, 101 (10th Cir.1981); *Marshall v. North American Car Co*., 626 F.2d 320, 324 (3d Cir.1980); *Marshall v. Central Mine Equipment Co.,* 608 F.2d 719, 720–21 n. 1 (8th Cir.1979); *In re Establishment Inspection of Asarco, Inc*., 508 F.Supp. 350, 353 (N.D.Tex.1981); *West Point-Pepperell, Inc. v. Marshall*, 496 F.Supp. 1178, 1186 (N.D.Ga.1980), rev'd on other grounds, 689 F.2d 950 (11th Cir.1982); *Marshall v. Pool Offshore Co*., 467 F.Supp. 978, 981–82 (W.D.La. 1979). The proposed expanded inspection must be "based upon a reasonable belief that a violation has been or is being committed" with "specific evidence sufficient to support a reasonable suspicion of a violation." *Mar-Jac*, 756 Fed. Appx. at 861 quoting *West Point-Pepperell*, 689 F.2d at 958.

A.    OSHA Lacks Probable Cause to Expand the Current Inspection

OSHA's current inspection is based solely on the January 28, 2020 fatal accident and, thus, is limited to potential violations of the OSH Act related to the release of N2 from the line 4 freezer. OSHA began pushing to significantly expand its investigation during the first on-site inspection and has continued pushing those

boundaries without the slightest regard for the legal limits of its authority or FFG's rights. (E.g. OSHA's overly broad Subpoenas, attached as Exhs. 3 and 4).

The complaint FFG assumes OSHA relies on for the warrant states:

1. On the morning of March 11, 2018, employees at the FFG Plant detected a strong smell of ammonia. Thereafter, employees experienced symptoms such as burning eyes, sore throat, nausea and headaches. Several workers had to go home because of the ammonia leak.
2. Emergency alarms did not go off at the Plant during either the leak of nitrogen or the leak of ammonia, which occurred on January 28, 2021 and March 11, 2021, respectively.
3. An effective emergency action plan has not been implemented in the facility. Employees have not received training on evacuation in case of an emergency, such as in the event of a toxic release of gas.
4. The facility has only one emergency exit available for 130 employees for use in case of emergency. A second emergency exit door is not accessible to the workers and remains locked. Workers need a key to access this door.
5. Employees from Line 1 are exposed to smoke from cooking oil causing significant eye pain including eyes tearing up, eyes burning and blurred vision. Proper personal protective equipment, such as eye protection, is not provided to employees.
6. There is no proper ventilation at Line 1 causing employees to walk away from this area to breathe fresher air. Employees are not provided respiratory protective equipment.
7. Line 1 often becomes too hot, especially during the summer. An effective heat stress prevention program is not in place.
8. A process safety analysis has not been conducted in the use of ammonia.

(Exh. 1). On the other hand, the warrant permits a wall-to-wall inspection of:

1. all areas "within the plant where ammonia refrigeration and ammonia storage systems are located"
2. "all alarm systems intended to provide early warning of releases of hazardous chemicals"

3. "all emergency exits and means of egress"
4. all "production lines to conduct noise measurements"
5. "Line 1 for purposes of evaluating the ventilation system, conducting air-quality monitoring, and evaluating personal protective equipment"
6. "emergency action plans and training records"
7. "all required safety and health records required to be kept in compliance with the Act"
8. "records, procedures and policies pertaining to the potential violations identified above.

The complaints do not address all issues for which OSHA convinced this Court to issue a warrant and those addressed lack sufficient particularity for probable cause.

*1. Ammonia*

The complaint about ammonia involves a single incident. When the undersigned discussed this complaint with CSHO Bennett, OSHA had obtained no information about what line or area of the plant in which this incident occurred. OSHA demanded to expand its inspection wall-to-wall for everything related to FFG's ammonia system within Plant 4 to include dozens of pressurized vessels, two separate machine rooms, condensers, the HVAC system and all pipes and valves through which the ammonia travels.

OSHA is only permitted to inspect and, thus, obtain a warrant to inspect when a complaint provides sufficient facts to determine that a health or safety standard may have been violated. OSHA's permissible exposure limit ("PEL") for ammonia

is 50 parts per million ("ppm") averaged over an eight-hour work day.[2]  That means that a person can be exposed to 100 ppm of ammonia for four hours of their work day without violating an OSHA standard.  *Id*.  According to the CDC, ammonia exists naturally in the environment and people are routinely exposed to it in a variety of ways including cleaning supplies.[3]  Humans smell ammonia at just 5 ppm.  *Id*. "Therefore, you will probably smell ammonia before you are exposed to a concentration that may harm you." *Id*.

As the complaint reported, the moment employees smelled ammonia, FFG permitted employees to leave the area until the area was tested and confirmed to not have a detectible level of ammonia.  The experts who responded to employees reporting the smell of ammonia confirmed at the time of the incident that there was no ammonia levels detected in the area.  FFG conveyed this information to OSHA and offered to provide the licensed third-party refrigeration technician's reading. The HCFD also came, albeit hours later, and confirmed no detectible level of ammonia.  OSHA responded by demanding to be allowed to expand to a wall-to-wall inspection of the entire ammonia system.

Contrary to the third-party organization who conveyed the alleged employee complaints, FFG received no employee complaints regarding "burning eyes, sore

---

[2] https://www.osha.gov/sites/default/files/2019-03/fs4-howmuch2.pdf; https://www.osha.gov/laws-regs/standardinterpretations/2005-04-04-0
[3] https://www.atsdr.cdc.gov/toxprofiles/tp126-c1.pdf

throat, nausea or headaches" from the few employees who smelled ammonia on March 11, 2021.  There was no request for medical attention for such conditions or requests to leave work as a result of any symptom.  There is no question that a tiny amount of ammonia creates a strong smell with unpleasant effects including temporary burning eyes or brief sore throat neither of which rise to the level of a potential OSHA violation.  Nothing in the complaint suggests an exposure that might have exceeded the PEL, which would be required for there to be a potential OSHA violation.  OSHA's warrant application apparently did not even request the right to test the actual hazard complained about (exposure to ammonia in the air) as that is not in the warrant.  Rather, the warrant merely says the areas in which the ammonia refrigeration or storage units exist can be inspected.

The warrant's language technically does not limit OSHA to inspecting the ammonia system.  Instead, it appears to give OSHA the right to inspect whatever it wants in all areas of Plant 4 where ammonia refrigeration and storage systems are located.  The warrant may have intended to, but does not expressly, limit OSHA to inspecting the ammonia system in these areas.  Because the complaint alleges no facts that support a potential safety violation and the complaint relates to airborne exposure to ammonia and not a potential violation of the ammonia system, the warrant related to this item should be quashed.

2.  *Alarm Systems*

The complaint alleges that no alarms sounded at the time employees smelled ammonia presumably resulting in the warrant including "all alarm systems intended to provide early warning of releases of hazardous chemicals." For the reasons discussed in the prior section, there is no facts that a high enough level of ammonia existed to set off an alarm or otherwise suggest a problem with FFG's alarm systems that could be an OSHA violation. The complaint also refers to no alarm on January 28, 2021. But, OSHA knows that FFG's alarm sounded that day as it notified the fire department. The warrant is also overbroad in that it includes alarms related to all "hazardous chemicals" when the complaint only refers to ammonia and N2. Moreover, OSHA already subpoenaed and received all alarm data for Plant 4. (Exh. X, paragraphs 9 and 10). As the complaint provides no probable cause that a violation may have occurred related to FFG's alarm system, the scope is overbroad, and OSHA always received all alarm data, this part of the warrant should be quashed.

3. *Emergency Exits and Means of Egress*

OSHA knows the facility has more than one emergency exit. OSHA definitively knows that the front, back and sides of the building each have multiple doors. CSHO Bennett, who appears to have provided the affidavit for this warrant, personally accompanied FFG and the HCFD for the annual fire inspection during which all exits and means of egress were observed and inspected. If an emergency exit was locked and required a key as the complaint alleges HCFD would have cited

16

it as a code violation and not passed the fire inspection. FFG permitted OSHA to accompany this inspection, which covered the entirety of Plant 4, and OSHA has extensively questioned people about these topics during interviews. Moreover, FFG has not objected to OSHA investigating egress issues related to the time of the incident. What OSHA appears to seek is the right to inspect means of egress throughout the facility *during operations*, which the complaint does not address. The warrant goes beyond emergency exits and therefore beyond the complaint when it includes all "means of egress." As OSHA has all the information it needs to address the facts alleged in the complaint, the portion of the warrant related to exits and means of egress should be quashed.

### 4. Noise Sampling on All Production Lines

There is nothing in the complaint related to noise. Yet, the warrant grants OSHA permission to perform noise sampling on all production lines which requires pulling employees from the line and interrupting them multiple times to perform the sampling. As the complaint makes no mention of a noise issue, much less facts that would support that a violation of a noise standard might exist, the portion of the warrant regarding noise should be quashed.

Assuming some facts exist that supported this part of the warrant, they are not likely sufficient to support such a broad scope encompassing all production lines because there would be no employees other than supervisors who would have

knowledge about all production lines. A complaint inspection must be limited to the complaint items and cannot be used as a springboard for additional investigations beyond the scope of the initial complaint. *Sarasota Concrete*, 693 F.2d at 1064. "When nothing more is offered than a specific complaint relating to a localized condition, probable cause exists for a search to determine only whether the complaint is valid." Id. at 1069. Courts have noted that the intrusiveness of a full scope inspection is not insignificant, as they often extend over a period of weeks and cause disruption, inconvenience, and lost employee time. *Id*. at 1069, n.9, citing *Cerro Metal Products v. Marshall*, 620 F.2d 964, 974 n. 27 (3d Cir.1980). OSHA's attempt to address noise on *all* production lines is the exact inappropriate over-reaching that courts consistently reject. *E.g. North American*, 626 F.2d at 324 (rejecting OSHA's argument that a complaint of a potential violation in a particular area can support a wall-to-wall inspection even if limited to that one potential violation). As no probable cause exists or if some undisclosed probable cause exists but cannot support including all production lines, the portion of the warrant related to noise sampling should be quashed.

### 5. Air Monitoring and PPE on Line 1

The complaint alleges that there is smoke from cooking oil without proper ventilation resulting in eye irritation and employees having to walk away to get fresh air. And, PPE such as eye protection and respiratory protection is not provided.

Although OSHA has attempted to inspect general ventilation, which is beyond the scope of the complaint, OSHA has not attempted to test the air or ventilation on line 1 related to smoke from cooking oil. "When nothing more is offered than a specific complaint relating to a localized condition, probable cause exists for a search to determine only whether the complaint is valid." *Sarasota Concrete*, 693 F.2d at 1069. To do so, OSHA will have to identify the PEL for whatever agent it believes is causing the smoke and test to determine if the levels exceed the PEL. Instead, OSHA is attempting to use this part of the warrant to test ventilation and air-quality, in general, and evaluate all "personal protective equipment" as opposed to the limited items (eye and respiratory protection) alleged in the complaint. Here, to the extent there is probable cause, it is limited to OSHA determining whether the smoke created by cooking oil on line 1 is such that an OSHA standard may be violated and require different ventilation, eye protection or respiratory protection. Accordingly, the warrant should be quashed, and OSHA should seek to perform this limited inspection which FFG would allow without a warrant.

### 6. *Emergency Action Plan, Training Records and All Other Records*

OSHA apparently sought from this Court a warrant to inspect and obtain records that FFG already voluntarily provided OSHA. In response to requests 4 and 12 from OSHA's first subpoena, copies of FFG's Emergency Evacuation Plan, Emergency Action Plan, and records of training related to those plans were provided

to OSHA approximately two months ago.  FFG has also recently provided OSHA its onboarding training video in English and Spanish, and OSHA has inquired extensively during interviews about these programs and training on them.  All of this has been done voluntarily as part of FFG's ongoing extensive cooperation with OSHA's investigation.  To the extent OSHA believes the complaint has merit (i.e. that an appropriate program has not been sufficiently implemented) OSHA has all the information needed to determine whether it constitutes an OSHA violation. Accordingly, this portion of the warrant should be quashed.

The remaining item in the warrant grants OSHA the right to "all required safety and health records required to be kept in compliance with the Act."  Other than the specific records identified in the complaint, there does not appear to be any bases to support that a violation exists as related to all records OSHA regulations require FFG to maintain.  Without being more specific or having facts that relate to all such records, the warrant is overbroad and should be quashed.

B. <u>OSHA Cannot Use Information Obtained During Its Illegal Entry</u>

On January 28, 2021, OSHA illegally entered Plant 4 in violation of FFG's Fourth Amendment rights, in violation of OSHA's own regulations[4] and at a time

---

[4] OSHA's regulations require the CSHO to permit an employer representative to accompany OSHA during any inspection.  29 C.F.R. § 1903.8.  OSHA not only blatantly violated FFG's constitutional rights, but blatantly ignored its own regulations while trampling on FFG's rights that OSHA claims to guarantees to employers.

that the building was not safe to enter. CSHO Bennett and CSHO Xavier Cruz-Santiago accompanied the HCFD in re-entering Plant 4 after rescue efforts were complete.  Neither CSHO Bennett nor anyone else from OSHA bothered to inform FFG that it was on FFG's property or intended to enter Plant 4.  As the Supreme Court has made clear, OSHA was not permitted to enter FFG's property without obtaining FFG's consent, which was not requested or provided, or after obtaining a warrant, which also was not sought or obtained.  OSHA took over 200 photos during its illegal entry and either tampered with or stood by while others tampered with important evidence directly related to the accident.  The photos taken by OSHA along with additional photos taken by the HCFD during this entry show that someone opened and closed at least one door to the line 4 freezer as there are photos with the door open and others with the door closed.  OSHA's photos also show that OSHA accessed FFG's private data and risked altering or losing critical evidence that experts will use to determine the cause of the accident, which might bring some answers to those who lost loved ones in this fatal accident, and prevent future loss of life.  Specifically, OSHA either tampered with the line 4 freezer's digital control panel or stood by while someone else did and documented the act with photos that depict different screens from the control panel that would have required someone to manually manipulate the panel to move from one screen to the next.  OSHA's

cavalier, illegal and unwarranted conduct trampled on FFG's constitutional rights and severely prejudiced all involved denying them of an untainted investigation.

No information that OSHA obtained during its illegal entry or any information stemming from its illegal entry can be lawfully used to support this warrant. Because OSHA chose to secretly obtain this warrant without providing FFG or the public the benefit of knowing the information it alleged to seek the warrant, OSHA may have secretly used information gained during its unlawful entry in its warrant application. In *Murray v. United States*, 487 U.S. 533, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988), agents made a warrantless search of a warehouse, during which they saw bales of marijuana in plain view. The agents then applied for a search warrant, without mentioning their prior unlawful entry. The warrant presented probable cause, independent of the agents' observations during their earlier entry, and was issued. On review, the Court resorted to the independent source doctrine when considering whether the marijuana, seized pursuant to the search warrant, should be suppressed:

> The ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.

See also *United States v. Lauer*, 2010 U.S. Dist. LEXIS 27596, *19 (S.D. Fla. 2010) (government should have fully disclosed its prior warrantless search to court that

issued the warrant). FFG should be provided the application, including affidavit(s), OSHA used to support its warrant application to ensure that no information obtained during OSHA's illegal search of FFG's property was included.

C.     The OSHA 300 Logs are Insufficient to Expand the Inspection

As this Court held in *Mar-Jac* and the Eleventh Circuit affirmed, information from OSHA logs do not support expanding an unprogrammed inspection such as this one. To the extent OSHA relied on OSHA logs, which FFG provided to OSHA on January 29, 2021, the information is insufficient and should not be allowed to be relied upon to obtain a warrant such as the one granted on April 20, 2021, that expands the limited inspection to a wall-to-wall inspection or expanding to include items not related to the initial inspection. As OSHA chose to file its warrant application under seal, FFG has not been provided the information to know whether OSHA relied on such information.

D.     FFG has Cooperated and Permitted OSHA to Perform all Lawful Inquiries

As described above, FFG consented to OSHA's investigation during OSHA's opening conference on January 29, 2021. FFG provided OSHA and numerous other government agencies information and documents, and arranged more than 100 interviews, in the weeks following the accident. FFG has continued to cooperate and provide support for the ongoing investigation of the N2 release. FFG has produced to OSHA over one thousand pages of documents and its managers have

sat for multiple interviews each. There is little to nothing in FFG's possession that OSHA has requested that FFG has not already provided to OSHA. FFG facilitated dozens of inspections through Plant 4 and continues to coordinate and participate in additional testing protocols of the line 4 freezer for experts to obtain more information about how the accident occurred and how to avoid a similar accident elsewhere. In fact, FFG's lawyer arranged and participated in a manager interview on April 20, 2021, with CSHO Bennett apparently shortly after she swore out factgs for the warrant. As FFG has fully and voluntarily cooperated except where OSHA sought to expand its investigation without probable cause, as described above, the warrant should be quashed and if OSHA wants to inspect the alleged smoke on line 1 created by cooking oil FFG will continue to cooperate and assist OSHA in that limited investigation.

E.    Allowing this Inspection to Proceed will Cause Irreparable Harm to FFG

OSHA's unconstitutional search already has imposed considerable costs on FFG in terms of lost employee time, including management time, attorneys' fees, and losses in production and employees. *See generally Cerro Metals*, 620 f.2d at 974, n.27 (noting that OSHA inspections can impose significant burdens on employers in terms of disruption, inconvenience, and lost employee time). The infringement on FFG's constitutional rights to be free from unreasonable search and seizure, the right to counsel, and the takings clause are irreparable injuries that

require that this excessively broad warrant be quashed. Quashing this warrant is necessary to prevent irreparable injury in the form of abrogation of FFG's constitutional rights and resulting losses for which there are no remedies to recover. *Baldwin Metals and Mosher Steel v. Donovan*, 642 F.2d 768, 773 (5th Cir. (Unit A) 1981).

## CONCLUSION

As described above, the warrant compels FFG to submit to an unconstitutional investigation and is further tainted by OSHA's previous illegal entry onto FFG's premises. FFG gave limited consent to an investigation of the accident and environs, which OSHA has had ample opportunity to conduct and conclude. For the reasons provided above, FFG requests this Court quash the warrant issued on April 20, 2021 and order such other and further relief to FFG as the Court shall deem appropriate.

Respectfully submitted this 25th day of April, 2021.

/s/ Dane Steffenson
Dane Steffenson
Georgia Bar No. 677780
dsteffenson@littler.com
LITTLER MENDELSON, P.C.
3424 Peachtree Rd., NE, Suite 1200
Atlanta, GA 30326
T: (404) 233.2330

J. Larry Stine
Georgia Bar No. 682555
jls@wimlaw.com

WIMBERLY, LAWSON, STECKEL,
SCHNEIDER & STINE, P.C.
3400 Peachtree Rd., NE, Suite 400
Atlanta, GA 30326
T: (404) 365-0900
ATTORNEYS FOR FOUNDATION
FOODS GROUP, INC.

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rules 5.1(C) and 7.1(D), I certify that the foregoing pleading is typewritten using Times New Roman font, fourteen-point type.

DATED this 25th day of April, 2021.

/s/ Dane Steffenson
Dane Steffenson
Georgia Bar No. 677780

# THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | | |
|---|---|---|
| **In the Matter of the** | ) | |
| **Inspection of:** | ) | |
| | ) | |
| **Foundation Foods Group, Inc.** | ) | **Case No. 2:21-MC-16** |
| **Located at** | ) | |
| **2076 Memorial Park Drive** | ) | |
| **Gainesville, Georgia 30501** | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 25, 2021, I electronically emailed the Employer's **Emergency Motion to Quash Warrant and Memorandum in Support** per the Court's instruction to the Judge's Clerk for filing, and also served opposing counsel via e-mail to:

> Anthony DeCinque
> Assistant United States Attorney
> Northern District of Georgia
> U.S. Attorney's Office
> Richard B. Russell Federal Bldg.
> 75 Ted Turner Dr., SW, Suite 600
> Atlanta, GA 30303-3309
> Anthony.decinque@usdoj.gov

> */s/ Dane Steffenson*
> Dane Steffenson
> Georgia Bar No. 677780